UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAUREEN ABSTON, individually, and as Personal Representative of the Estate of RICHARD ABSTON; COREY ABSTON; JACY ABSTON; LINDA ABSTON,<br><br>        Plaintiffs,<br><br>vs.<br><br>CITY OF MERCED, a municipal corporation; RUSS THOMAS, in his capacity as Sheriff for the CITY OF MERCED; J. HART, individually and in his capacity as a police officer for CITY OF MERCED; B. DALIA, individually, and in his capacity as a police officer for the CITY OF MERCED; N. ARELLANO, individually and in her capacity as a police officer for the CITY OF MERCED; S. KESNEY, individually; and DOES 1-10, inclusive,<br><br>        Defendants. | 1:09-cv-00511 OWW DLB<br><br>MEMORANDUM DECISION AND ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION.<br><br>(DOC. 44) |

I.   INTRODUCTION

Maureen Abston, individually, and as personal representative of the Estate of Richard Abston, Corey Abston, Jacy Abston, and Linda Abston ("Plaintiffs") proceed with this action against the City of Merced, Sheriff Russ Thomas, Officer Jason Hart, Officer Bernard Dalia, and Officer Naomi Arellano ("Defendants")[1] alleging (1) civil rights violations pursuant to 42 U.S.C. § 1983

---

[1] Defendant Officer Shandra Kesney was voluntarily dismissed without prejudice on March 31, 2010. Doc. 32.

and the Fourth and Fourteenth Amendments of the Constitution; (2) assault and battery; (3) negligence – wrongful death; and (4) negligent hiring, retention, training, supervision, and discipline.[2] Before the court is Defendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication (Doc. 44). Plaintiffs filed an opposition (Doc. 51), to which Defendants replied (Doc. 54).

II.   FACTUAL BACKGROUND

A.   Undisputed Facts

1.   The Incident

On the morning of February 7, 2008, Officer Hart was stopped in traffic on the Childs Avenue overpass above Highway 99 in the City of Merced. Defendants' Statement of Undisputed Facts ("DUF") ¶ 1. Officer Hart was wearing a black polo shirt with an embroidered Merced Police Department badge, khaki-colored cargo pants, and a red baseball cap. DUF ¶ 2.

While stopped on Childs Avenue, Officer Hart observed a silver or gray pickup truck traveling southbound at a high rate of speed in a northbound lane of Highway 99. DUF ¶ 3. He subsequently learned that decedent Richard Abston ("Decedent") was driving the pickup truck. DUF ¶ 4. The pickup truck stopped on the median of the highway. DUF ¶ 5. Officer Hart initiated his

---

[2] Plaintiffs' Fifth Cause of Action for violation of California Civil Code Section 52.1, The Bane Civil Rights Act, was dismissed with prejudice on January 15, 2010. Doc. 30.

vehicle's emergency lights, exited traffic and pulled onto an island on the on-ramp to the highway. DUF ¶ 6.

California Highway Patrol ("CHP") Officer Shane Kensey was assigned to patrol Highway 99 in the Merced area that morning. DUF ¶ 7. While on the highway, Officer Kensey received a radio broadcast of a motorist driving the wrong way on Highway 99. DUF ¶ 8. At that time, he was approximately eight miles away from where the driver had been observed. DUF ¶ 9. Officer Kensey began proceeding northbound on Highway 99. DUF ¶ 10. As he approached Martin Luther King, Jr. Way, Officer Kensey observed a silver pickup truck traveling southbound on northbound Highway 99 at approximately 35 to 45 miles per hour. DUF ¶ 12.

Officer Kensey, whose lights and siren were on, approached Decedent's vehicle, which slowed and pulled into the center median of the highway. DUF ¶ 13. Officer Kensey exited his vehicle and contacted Decedent through the driver's side door of Decedent's vehicle. DUF ¶ 14. Decedent was yelling something incomprehensible to Officer Kensey regarding his son being in a hotel and not able to breathe. DUF ¶15. Officer Kensey ordered Decedent to exit his vehicle four or five times, but Decedent did not comply. DUF ¶ 16. Officer Kensey opened the door, undid Decedent's seatbelt and pulled Decedent out of the pickup truck. DUF ¶17. Decedent resisted violently, swinging his arms and fists as he was being pulled out of the truck. DUF ¶18. Officer Kensey

struck Decedent between two to five times in the thigh area with a side-handle baton, but it had no effect. DUF ¶¶ 19, 20.

Decedent began running southbound in the traffic lanes, roughly in the middle of the road. DUF ¶ 20. At that point, traffic was stopped on northbound Highway 99. DUF ¶ 21. Officer Kensey pursued Decedent, who started to climb up the cab of a stopped tractor trailer. DUF ¶ 22.

Officer Hart exited his vehicle. By the time Officer Hart reached the lanes of traffic, Decedent had climbed on top of a tractor trailor's cab. DUF ¶ 23. Officers Kensey and Hart gave verbal commands to Decedent to come down from the truck. DUF ¶ 24. Officer Kensey sprayed pepper spray into Decedent's face in multiple bursts until his entire, relatively large can of spray was empty. DUF ¶ 25. Officer Kensey asserts that the pepper spray had no effect on Decedent. DUF ¶ 26. Decedent wiped the spray from his chest and licked it off of his fingers. DUF ¶ 27.

At approximately the time Decedent climbed onto the cab of the tractor trailer, Officer Arellano arrived at the scene. DUF ¶ 28. She had responded to a dispatch call regarding a vehicle traveling in the wrong direction on Highway 99. DUF ¶ 29. All three officers climbed onto the cab of the tractor trailer. DUF ¶ 30. Decedent lay on top of the cab. DUF ¶ 31. The officers grabbed hold of Decedent and attempted to pull him down. DUF ¶ 32. Decedent first passively resisted their attempts, and then

4

began resisting actively, flailing his arms. DUF ¶ 33. Officer

Hart asserts that Decedent was very strong. DUF ¶ 34.

Decedent was not wearing a shirt by the time he was on the

cab of the tractor trailer. DUF ¶ 37. Officers Hart and Kensey

testified that they believed Decedent may have been under the

influence of an intoxicating substance such as alcohol and/or

methamphetamine, due to the glazed look in his eyes, his

fidgeting, his extreme strength, and his tolerance to pain. DUF ¶

40.

After reaching the ground from the cab of the tractor

trailer, Decedent began running southwest on Highway 99 again,

toward the center divider. DUF ¶ 41. A metal barrier

approximately three to four feet high was on the median,

separating the northbound from southbound lanes of traffic. DUF ¶

42. Officer Hart pursued Decedent on foot. DUF ¶ 43. Officer Hart

testified that he was concerned that Decedent might cross the

median into southbound traffic on Highway 99, which was still

moving. DUF ¶ 44.

Officer Hart testified that he continued to tell Decedent to

stop. DUF ¶ 45. Officer Hart drew his X26 Taser and told Decedent

once that he would tase him. DUF ¶ 46. Decedent did not stop. DUF

¶ 47. Officer Hart deployed his Taser at Decedent from eight to

twenty feet away; the Taser darts struck Decedent in the upper

back and lower back. DUF ¶¶ 48, 49. Decedent immediately fell to

the ground. DUF ¶ 50. Officer Hart testified that after the first Taser cycle of five seconds, Decedent attempted to get up. DUF ¶ 51. Officer Hart testified that he told Decedent to get back down and put his hands behind his back or he would be tased again. DUF ¶ 52. Officer Hart testified that Decedent began to crawl. DUF ¶ 53.

Officer Hart began wrestling with Decedent. DUF ¶ 55. Officers Kensey and Arellano arrived. DUF ¶ 56. Officer Kensey testified that Decedent was lying on his stomach, with his hands clasped underneath his chest. DUF ¶ 57. Officer Kensey ordered Decedent to comply. DUF ¶ 58. Officer Kensey testified that Decedent was violently resisting: kicking, yelling and screaming. DUF ¶ 59. All three officers attempted to subdue Decedent, with Officer Kensey toward his head, Officer Hart near his mid-section and Officer Arellano at his feet. DUF ¶ 60. Decedent continued to resist, and banged his head on the pavement. DUF ¶ 61.

Officer Hart warned Decedent that he would be tased again. DUF ¶ 62. He deployed the Taser for another five-second cycle near Decedent's left shoulder blade. DUF ¶ 63. Officer Hart believes that he applied the Taser a fourth time, also for a five-second cycle. DUF ¶ 64. Officer Hart testified that because Decedent was so strong, the officers were still unable to gain control of his hands. DUF ¶ 65. Officer Kensey was eventually able to free one of Decedent's arms and apply a handcuff to it.

DUF ¶ 66. The officers handcuffed Decedent in front to gain custody of his hands. DUF ¶ 67.

Officer Dalia responded to Officer Hart's radio call that someone had been tased. DUF ¶ 68. The officers attempted to gain control of Decedent's legs. DUF ¶ 69. Officers Hart and Kensey testified that Decedent continued to kick violently. DUF ¶ 70. One kick struck Officer Arellano. DUF ¶ 71. As Officer Hart attempted to gain control of Decedent's legs, Decedent kicked him hard in the right shoulder, resulting in a torn rotator cuff that later required surgery. DUF ¶ 72. Officer Dalia attempted to help Officer Hart keep Decedent down, while Decedent was kicking and squirming. DUF ¶ 73. Decedent kicked at Officer Dalia, pushing him backward with enough force to jolt him. DUF ¶ 74.

California Department of Corrections ("CDC") Officer Rowdy Kyle approached the officers and asked if they needed a leg restraint. DUF ¶ 75. Officer Hart testified that he held Decedent's head in place so that Decedent could not strike anyone with his head while the leg shackles were being placed on him. DUF ¶ 76. Officers Hart and Arrellano testified that the officers did not strike Decedent, but attempted to hold him in place. DUF ¶ 77.

Other CHP officers arrived at the scene, relieving the Merced police officers. DUF ¶ 78. Officer Dalia checked Officer Hart's injury while CHP officers remained with Decedent. DUF ¶

1  79.

2      Derrick Olzack, paramedic with Riggs Ambulance service, was

3  dispatched to the scene. DUF ¶ 80. When he arrived, he was

4  directed to Decedent, who was struggling with the officers

5  attempting to restrain him. DUF ¶ 81. Mr. Olzack helped to push

6  Decedent's hips down to keep him on the ground. DUF ¶ 82. At some

7  point after he was restrained, Decedent appeared to stop

8  breathing. DUF ¶ 83. After Decedent was placed in handcuffs and

9  leg shackles, Officers Hart and Dalia assisted CHP officers and

10  Mr. Olzack in pinning Decedent down against his further

11  resistance. Officers Hart and Dalia left the situation to the CHP

12  officers and Mr. Olzack at least two minutes before Mr. Olzack

13  rolled Decedent over to perform an assessment. DUF ¶ 84. Decedent

14  died shortly following the incident.

15      A bystander, Joe Spivey, captured video footage of the

16  incident, although it is unclear how much of the incident he

17  captured. DUF ¶ 36.

18              2.   Defendant Officers' Training

19      Officer Hart received basic Taser training at the POST

20  (Commission on Peace Officer Standards and Training) Academy, as

21  provided by the Anaheim Police Department, at some time between

22  2004 and 2007. DUF ¶ 85. When he was hired by the Merced Police

23  Department in 2007, Officer Hart received some additional basic

24  training, including Taser training. DUF ¶ 86. Officer Hart

received pain-compliance training for people under the influence of methamphetamine or other drugs. DUF ¶ 87. Officer Hart had been trained to avoid deploying a Taser to the head, neck or groin areas, as well as to areas of preexisting injuries. DUF ¶ 89.

Officer Dalia attended police academy and other training from 1994 to 1996. DUF ¶ 90. He received updated annual training through the Merced Police Department. DUF ¶ 91. Before this incident, he had been trained once in the use of a Taser through the Merced Police Department. DUF ¶ 92.

Officer Arellano was trained in the user of a Taser through the Merced Police Department in approximately 2005. DUF ¶ 93.

B.    Disputed Facts

        1.    The Incident

Officer Kensey testified that traffic is typically moderate to heavy around the area of Martin Luther King Way around the time of day the incident occurred, flowing between 60 and 65 miles per hour. Doc. 47, Ex. D, 22. Plaintiffs point to Joe Spivey's deposition, where he described traffic at the time of the incident as "moderately light. No heavy traffic."

Pointing to Officer Kyle's deposition, Plaintiffs assert that Officer Kyle stopped his car, got out and observed a physical altercation between Officer Kensey and Decedent, where they were both throwing blows at one another—Decedent with his hands and Officer Kensey with his baton. Doc. 53, Ex. B, 8-9, 21-

22. Decedent then turned and started running away. Officer Kensey chased after him and tackled Decedent, causing both of them to fall to the ground. *Id.* at 9, 23-24. The men struggled while on the ground. Officer Kensey had a grip on Decedent who tore out of his shirt in his attempt to be freed from Officer Kensey's grasp. *Id.* at 10-11, 22-23. Plaintiffs assert that Officer Kensey testified that at some point during the encounter Decedent had his shirt off but did not recall how he came to be topless and did not testify to tackling Decedent to the ground. Doc. 53, Ex. A, 17.

Plaintiffs assert that Decedent had an obvious 9-inch well-healed scar on his chest, where he had had open heart surgery and a pacemaker implanted two years before the incident. Defendants contend that Officer Hart and Officer Kensey did not notice a scar on Decedent's chest when he was shirtless on the hood of the truck. DUF ¶ 38. Plaintiffs point to Officer Kensey's police interview, in which Officer Kensey states that Officer Arellano told the officers she observed that Decedent had a large scar on his chest and told them not to use a Taser on him. Doc. 53, Ex. E, ¶ 9. Officer Arellano testified that she did not recall giving this warning or ever seeing a scar on Decedent's chest. Doc. 53, Ex. D, 24-25. Officer Hart testified that he did not hear anyone say that Decedent had a scar on his chest. DUF ¶ 39.

The amount of force Officer Defendants used to get Decedent

off the big rig is in dispute. Pointing to Officer Kensey's deposition, Defendants contend that the officers either pulled Decedent or he slipped down to the hood of the cab, then to the ground. DUF ¶ 35. Plaintiffs point to Officer Arellano's deposition, where she testified that the Officers simply let go of Decedent. Doc. 53, Ex. D, 29.

Pointing to Officer Hart's deposition, Plaintiffs assert that after Decedent was first tased, he fell to the ground on his face and was bleeding from his face. Doc. 52, Ex. C, 84-85.

Defendants assert that Officer Hart activated the Taser for a second five-second cycle but concluded that it was not functioning effectively. DUF ¶ 54. Pointing to Officer Hart's deposition, Plaintiffs contend that Officer Hart testified that the second cycle made some form of contact. Doc. 53, Ex. C, 90-91.

### 2.   Defendant Officers' Training

Defendants contend that with respect to responding to mentally impaired subjects, Officer Hart testified that Merced Police Department policy is to protect the mentally impaired person as well as the general public, taking into account the totality of the circumstances. DUF ¶ 88. Plaintiffs point out that Officer Hart testified that a subject's mental impairment is taken into account, but it doesn't always dictate what they do. Doc. 53, Ex. C, 23. Plaintiffs assert that Officer Hart testified

that while he has been trained generally with responding to suspects who appear to be under the influence, he has not had any direct training on use of force against subjects who appear mentally impaired. *Id.* at 22-23.

Plaintiffs assert that Officer Hart testified that he was not aware that the Taser should not be applied on people with implanted pacemakers or defibrillators, or who have apparent heart conditions. *Id*. at 17-18, 114-115. Nor has Officer Hart been trained that Taser exposure should be limited on those suffering from excited delirium symptoms and has received no training on responding to suspects with excited delirium. *Id.* at 17, 117-118.

Plaintiffs assert that Officer Arellano testified that she received brief Taser training at police academies. Doc. 53, Ex. D, 16. Officer Arellano testified that she did not recall receiving: any subsequent training through the Merced Police Department, updated materials or bulletins on Taser use, any training on avoiding Taser use on preexisting injuries, prolonged or extended use, or use on suspects showing symptoms of excited delirium. *Id.* at 16-18. Officer Arellano testified that she had no real knowledge of the excited delirium condition and did not recall being trained on encountering suspects with excited delirium symptoms. *Id*. at 17-18.

12

### III. <u>LEGAL STANDARD</u>

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986) (internal quotation marks omitted). A fact is material if it could affect the outcome of the suit under the governing substantive law; "irrelevant" or "unnecessary" factual disputes will not be counted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

If the moving party would bear the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, if the non-moving party bears the burden of proof on an issue, the moving party can prevail by "merely pointing out that there is an absence of evidence" to support the

non-moving party's case. *Id.*

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In ruling on a motion for summary judgment, a court does not make credibility determinations or weigh evidence. *See Anderson*, 477 U.S. at 255. Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. Fed. R. Civ. P. 56(e). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun*, 509 F.3d at 984.

## IV.  ANALYSIS

A.  **First Cause of Action: Excessive Force (42 U.S.C. § 1983, Fourth Amendment)(Against Officers Hart, Dalia, Arellano, and Does 1-10)**

1.  **42 U.S.C. § 1983**

Section 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured

14

in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). To state a claim under 42 U.S.C. § 1983, a plaintiff must show (1) the violation of a right secured by the Constitution or a federal law, and (2) that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250 (1988). Here, Plaintiffs assert claims against Officers Hart, Dalia, and Arellano ("Officer Defendants") for violation of the Fourth and Fourteenth Amendments.

### 2.   Fourth Amendment Claim

Plaintiffs assert a claim of excessive force, which is examined under the Fourth Amendment's prohibition against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865 (1989). Fourth Amendment analysis requires balancing of the quality and nature of the intrusion on an individual's interests against the countervailing governmental interests at stake. *Id.* at 396. Use of force violates an individual's constitutional rights under the Fourth Amendment where the force used was objectively unreasonable in light of the facts and circumstances confronting them. *Id.* at 397. Excessive force

inquiries require balancing of the amount of force applied against the need for that force under the circumstances. *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003). "Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . summary judgment or judgment as a matter of law . . . should be granted sparingly" in cases involving claims of excessive force. *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1106 (9th Cir. 2008) (quoting *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003)); *see also Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury.") (quoting *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997)).

a)   <u>Constitutional Violation</u>

(1)   <u>Quantum of Force</u>

Officer Hart tased Decedent in dart mode four times. When Officer Hart tased Decedent the first time, Decedent was running away from Officer Defendants. Officer Hart deployed the taser from eight to twenty feet away, and the darts struck Decedent in the upper and lower back. Decedent immediately fell on his face onto the concrete; Mr. Spivey's video shows Decedent's face covered in blood. Officer Hart tased Decedent three more times after Decedent had already fallen and was laying face down on the ground with the officers over Decedent.

The Ninth Circuit has characterized the use of tasers in dart mode as an "intermediate or medium, though not insignificant, quantum of force." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). "The pain is intense, is felt throughout the body, and is administered by effectively commandeering the victim's muscles and nerves. Beyond the experience of pain, tasers result in 'immobilization, disorientation, loss of balance, and weakness,' even after the electrical current has ended." *Id.* at 825. Defendants acknowledge the seriousness of the intrusion on Decedent's Fourth Amendment interests resulting from the use of the Taser in dart mode.

The amount of force Officer Defendants used to remove Decedent from the top of the tractor trailer is in dispute. Pointing to Officer Kensey's deposition, Defendants contend that the officers either pulled Decedent or he slipped down to the hood of the cab, then to the ground. Plaintiffs point to Officer Arellano's deposition, where she testified that the Officers simply let go of Decedent and let him fall the high distance to the ground. Doc. 53, Ex. D, 29. Mr. Spivey's video shows the officers holding onto Decedent's waist on top of the truck with Decedent bent over, and Decedent falling from the truck to the concrete ground.

Officer Defendants collectively used their hands and weight of their bodies to restrain Decedent on the ground. There is no

allegation that Officer Defendants struck or hit Decedent once he was on the ground; however, the collective force of numerous officers applying force on Decedent as he lay on his stomach was potentially severe. Mr. Spivey's video shows that Officer Defendants, Officer Kensey, and then later CHP officers and the paramedic, pressed their body weight onto Decedent's prone back and body for over three minutes. In *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003), the Ninth Circuit concluded that although the officers did not shoot or beat the plaintiff, the alleged force was "severe and, under the circumstances, capable of causing death or serious injury" where the officers continued to press their weight on his neck and torso as he lay handcuffed on the ground.

The quantum of force Officer Defendants used must be balanced against the need for that force. *Meredith v. Erath*, 342 F.3d at 1061.

> (2)   Government's Interest in Use of Force

The government's interest in the use of force is evaluated by examining the three core factors of *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865 (1989): (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Bryan v. MacPherson*, 630 F.3d at 818 (quoting *Graham*, 490

U.S. at 396). The three *Graham* factors are not exclusive; courts examine the totality of the circumstances and consider "whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan v. MacPherson*, 630 F.3d at 826 (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). The Ninth Circuit has also considered the availability of alternative methods of capturing or detaining the suspect, *Luchtel v. Hagemann,* 623 F.3d 975, 980 (9th Cir. 2010), the suspect's mental and emotional state, *id.*, and whether the police officers gave the suspect any warnings where feasible, *Bryan v. MacPherson*, 630 F.3d at 831. An officer's actions must be examined "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Many factors weigh in favor of finding excessive force. First, Decedent's alleged crimes, driving down the wrong side of the highway and being under the influence of a controlled substance, were neither violent nor severe. *See Bryan v. MacPherson*, 630 F.3d at 828 ("Traffic violations generally will not support the use of a significant level of force."); *Tatum v. City & Cnty. of S.F.*, 441 F.3d 1090, 1096 (9th Cir. 2006) (being under the influence of a controlled substance is not a severe crime).

Second, the most significant factor under *Graham* is whether

19

the suspect poses an immediate threat to the safety of the officers or others. *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). It is undisputed that Decedent was unarmed, and there is no evidence that Officer Defendants thought Decedent was armed or posed a danger to their safety.

Third, Decedent was exhibiting unusual behavior, sweating profusely, and yelling something incomprehensible about his son being in a hotel and not able to breathe, and Officer Defendants suspected that Decedent may have been under the influence of methamphetamine. Citing *Luchtel*, 623 F.3d at 980, Defendants contend that Decedent's mental illness or intoxication only increased the violence of his resistance and did not require a lesser degree of force. However, "[e]ven when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Deorle v. Rutherford,* 272 F.3d 1272, 1283 (9th Cir. 2001).

Fourth, when Officer Hart tased Decedent the second through fourth times and when Officer Defendants applied their body weight to restrain Decedent, Decedent was on the ground, no longer running, within the officers' control, with numerous other officers standing nearby and above Decedent; the need for

significant force was decreased.

Other factors weigh against a finding of excessive force. First, it is undisputed that Decedent was actively resisting arrest and running away from Officer Defendants. *See Luchtel*, 623 F.3d at 981 ("[A] person does not have the right to resist arrest even if the charges are false or the arrest unlawful.") (quoting *United States v. Willifong*, 274 F.3d 1297, 1301 (9th Cir. 2001). Decedent violently resisted Officer Defendants, kicked Officers Dalia and Arellano, and kicked Officer Hart hard in the right shoulder, tearing his rotator cuff, which later required surgery.

Second, although Decedent was on the median of Freeway 99 and traffic had been stopped on the northbound lanes of Freeway 99, the southbound lanes were still open, and there was a risk that Decedent would run into the open southbound lanes of the freeway or that the incident might cause a traffic accident. These conditions created the risk of harm to others.

Third, the officers repeatedly identified themselves to Decedent, ordered Decedent to stop, and Officer Hart gave Decedent a warning before tasing him at least the first three times. *Deorle v. Rutherford,* 272 F.3d 1272, 1284 (9th Cir. 2001) ("[W]arnings should be given, when feasible, if the use of force may result in serious injury, and that the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test.").

21

1
2
3
4
5
6
7

Fourth, before Officer Hart tased Decedent and the Officer Defendants used their body weight to restrain Decedent, Officer Kensey had already used other alternative tactics: baton strikes and pepper spray. *See Bryan v. MacPherson*, 630 F.3d at 831 (requiring police officers to consider whether alternative tactics are available to affect an arrest).

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

There is a genuine issue of material fact whether the officers saw Decedent's 9-inch scar on his chest from Decedent's open heart surgery and pacemaker. Defendants contend that Officer Hart and Officer Kensey did not notice a scar on Decedent's chest when he was shirtless on the hood of the truck. Plaintiffs assert that Officer Kensey testified during his police interview that Officer Arellano told the officers that Decedent had a large scar on his chest and told them not to use a Taser on him. Doc. 53, Ex. E, ¶ 9. Officer Arellano testified that she did not recall giving this warning or ever seeing a scar on Decedent's chest. Doc. 53, Ex. D, 24-25. Officer Hart testified that he did not hear anyone say that Decedent had a scar on his chest. DUF ¶ 39. This fact is in dispute.

23
24
25
26
27

The amount of force Officer Defendants used to get Decedent down from the tractor trailer is also in dispute. Defendants assert that Officers Hart and Arellano merely grasped, or attempted to grasp, Decedent with their hands to bring Decedent down to the ground to safety. Pointing to Officer Kensey's

28

deposition, Defendants contend that Officers Hart and Arellano either pulled Decedent or he slipped down to the hood of the cab, then to the ground. Plaintiffs point to Officer Arellano's deposition, where she testified that the Officers simply let go of Decedent and let him fall a substantial distance to the ground. Doc. 53, Ex. D, 29.

Whether Officer Defendants' use of force was excessive under the totality of the circumstances is a difficult question. There are material factual disputes regarding (1) the amount of force used and (2) whether Officer Hart tased Decedent and Officer Defendants restrained Decedent with their bodies despite being cognizant of his 9-inch chest scar and heart condition. Where facts are disputed, their resolution and determinations of credibility are "manifestly in the province of a jury." *Wall v. Cnty. of Orange*, 364 F.3d 1107, 1110 (9th Cir. 2004) (quoting *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002)). Viewing the facts in the light most favorable to, and drawing all inferences in favor of, Plaintiff, without making credibility determinations,  a reasonable fact finder could find that Officer Defendants' use of intermediate, and ultimately deadly, force was objectively unreasonable.

> b)   <u>Qualified Immunity</u>

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982). The protection of qualified immunity applies regardless of whether the government official makes an error that is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S.Ct. 1284 (2004) (KENNEDY, J., dissenting)). The doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law ...." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986). Because qualified immunity is "an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985) (emphasis deleted).

The qualified immunity inquiry has two prongs: (1) "whether the facts that a plaintiff has alleged ... or shown ... make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quoting *Pearson v. Callahan*, 129 S.Ct. at 815-816). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be

clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151 (2001). This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case. *Id.* at 201. "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 129 S.Ct. at 823.

In *Bryan v. MacPherson*, 630 F.3d at 826, the Ninth Circuit held that the use of a taser and similar devices in dart mode constitutes an "intermediate, significant level of force that must be justified by the governmental interest involved" and that such law is clearly established. The Ninth Circuit, however, held that the law regarding tasers was not clearly established in 2005 when the incident in question occurred. *Id.* at 833. The Ninth Circuit also noted that two recent Ninth Circuit panels concluded that the law regarding tasers is not sufficiently clearly established to warrant denying officers qualified immunity. *Id.* (citing *Mattos v. Agarano*, 590 F.3d 1082, 1089-90 (9th Cir. 2010)*, reh'g en banc granted*, 625 F.3d 1132 (9th Cir. 2010), and *Brooks v. City of Seattle*, 599 F.3d 1018, 1031 n.18 (9th Cir. 2010))*, reh'g en banc granted*, 623 F.3d 911 (9th Cir. 2010)). Under *Bryan v. MacPherson*, Officer Hart would be entitled to qualified immunity for applying the taser to Decedent.

25

1    This case, however, is about more force than tasing alone.

2    Officer Defendants, along with Officer Kensey, CHP officers, and

3    the paramedic, applied pressure to Decedent's back, with

4    Decedent's stomach pressed into the ground. At the point when

5    Officer Hart applied the second, third, and fourth taser

6    applications, Decedent was already on the ground, on his stomach,

7    bleeding from his face, with the Officer Defendants standing over

8    Decedent. According to the report of forensic pathologist Dr.

9    Werner Spitz:

10

11       The process of dying in Richard Abston was initiated by the
         fact that lack of adequate amounts of oxygen from inability
12       to breathe caused arrhythmia of the heart beat, followed by
         cardiac arrest. The records clearly indicate that Abston's
13       death was progressive, not instantaneous by any means. This
         was a death by asphyxiation, due to lack of oxygen
14       availability.

15   Doc. 53, Ex. I, 5.

16

17       In consideration of the circumstances surrounding the death
         of Richard Abston and the timely relationship between the
18       restraint and the absence of vital signs, the type of
         restraint and the absence of significant findings at the
19       autopsy, it is my opinion that Richard Abston died of
         asphyxia due to inability to breathe, as a result of air
20       hunger due to compression and being pinned to the ground.
         This type of death is often referred to as positional
21       asphyxia. Exposure to ECD/MCD deployments and fear of
         impending doom constituted a significant factor in causing
22       the death.

23

24   *Id.* at 8. A reasonable officer should have known that all the

25   Officer Defendants exerting pressure on Decedent while he was

26   pinned on his stomach posed a danger of compression or restraint

27   asphyxia.

28
                                   26

Defendants cite *Luchtel*, 623 F.3d at 977-978, a case where two officers pinned a woman who was under the influence of crack cocaine to the floor and handcuffed her against her continued resistance. The plaintiff in *Luchtel* suffered a dislocated shoulder and torn shoulder ligaments, bruises, swelling, and abrasions from being pinned to the floor. Decedent in this case, however, suffered not only bruises and abrasions, but died from continued body weight on his back and body. In *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d at 1056, the Ninth Circuit held that two officers who "continued to press their weight into [an individual's] neck and torso as he lay handcuffed on the ground and begged for air" was excessive force. "Under similar circumstances, in what has come to be known as 'compression asphyxia,' prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers." *Id.* The Ninth Circuit concluded that the officers were not entitled to qualified immunity, as any reasonable officer would have known that such conduct constituted excessive force. *Id.* at 1061-1062. *Drummond* is from 2003; the Ninth Circuit's view on compression asphyxia was therefore clearly established in 2008, when the incident occurred.

Defendants' motion for summary judgment on the Fourth Amendment claim in the First Claim for Relief on the grounds of qualified immunity is DENIED.

1

B.   **First Cause of Action: Substantive Due Process (42 U.S.C. § 1983, Fourteenth Amendment)(Against Officer Defendants and Does 1-10)**

2

3

1.   **Constitutional Violation**

4

The Ninth Circuit recognizes that a "child's interest in her

5

relationship with a parent is sufficiently weighty by itself to

6

constitute a cognizable liberty interest." *Curnow By & Through*

7

*Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).

8

Ninth Circuit precedent suggests that Decedent's wife may also

9

assert such interest. *See Crumpton v. Gates*, 947 F.2d 1418, 1421

10

(9th Cir. 1991).

11

Official conduct that "shocks the conscience" in depriving

12

someone of their familial interest is cognizable as a due process

13

violation. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).

14

In determining whether excessive force shocks the conscience, the

15

first inquiry is "whether the circumstances are such that actual

16

deliberation by the officer is practical." *Wilkinson v. Torres*,

17

610 F.3d 546, 554 (9th Cir. 2010) (quoting *Porter v. Osborn*, 546

18

F.3d at 1137) (internal brackets omitted). Where actual

19

deliberation is practical, an officer's "deliberate indifference"

20

may suffice to shock the conscience. *Id.* If an officer "makes a

21

snap judgment because of an escalating situation, his conduct may

22

only be found to shock the conscience if he acts with a purpose

23

to harm unrelated to legitimate law enforcement objectives." *Id.*

24

In *Porter*, 546 F.3d at 1137, the Ninth Circuit found that actual

25

deliberation was not practical for an officer faced with an

26

27

28

28

evolving set of circumstances over five minutes necessitating "fast action" and "repeated split-second decisions." *Id.* at 1139.

Plaintiffs contend that Officer Defendants had ample time to deliberate and reflect on their actions and were not faced with a rapidly escalating, evolving set of circumstances. The entire incident, however, only lasted a few minutes, and occurred on and alongside a freeway. Officer Defendants made snap judgments without time for deliberation, and their conduct will only shock the conscience if they acted "with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* at 1137.

Plaintiffs argue that Officer Defendants acted with a purpose to harm unrelated to legitimate law enforcement objectives because Officer Kensey asked Officer Hart if he had a less lethal weapon other than a taser, Officer Arelano observed Decedent's chest scar and admonished the other officers not to tase Decedent, and the Officer Defendants piled on top of Decedent until he was non-responsive and died. This evidence does not show, and no other evidence shows, that Officer Defendants had any purpose to harm Decedent apart from law enforcement objectives to take Decedent into custody. Plaintiffs' Fourteenth Amendment claim is unsupported.

    2.   Qualified Immunity

There is no evidence that Officer Defendants violated Plaintiffs' Fourteenth Amendment rights. Officer Defendants are

entitled to qualified immunity. Defendants' motion for summary

judgment on the Fourteenth Amendment claim in the First Cause of

Action is GRANTED.

    C.    <u>Second and Third Causes of Action: Unconstitutional
Custom or Policy (Against City of Merced, Sheriff
Thomas, and Does 11-25)</u>

A municipality may be held liable under Section 1983 "when

execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury." *Monell v. Dep't

of Soc. Servs.*, 463 U.S. 658, 694, 98 S.Ct. 2018 (1978). To

prevail under a Section 1983 claim against a local government, a

plaintiff must show: (1) he or she was deprived of a

constitutional right; (2) the local government had a policy; (3)

the policy amounted to a deliberate indifference to his or her

constitutional right; and (4) the policy was the moving force

behind the constitutional violation. *Burke v. Cnty. of Alameda*,

586 F.3d 725, 734 (9th Cir. 2009). There are three ways to show a

municipality's policy or custom:

> (1) by showing "a longstanding practice or custom which
> constitutes the 'standard operating procedure' of the local
> government entity;" (2) "by showing that the decision-making
> official was, as a matter of state law, a final policymaking
> authority whose edicts or acts may fairly be said to
> represent official policy in the area of decision;" or (3)
> "by showing that an official with final policymaking
> authority either delegated that authority to, or ratified
> the decision of, a subordinate."

*Menotti v. Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005)(quoting

*Ulrich v. San Francisco*, 308 F.3d 968, 984-85 (9th Cir. 2002)).

30

Here, Plaintiffs assert two *Monell* claims: (1) failure to train and (2) ratification.

### 1.   Failure to Train

Failure to train may serve as a basis for Section 1983 liability where the failure to train amounts to "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197 (1989). *Monell* is not satisfied by only alleging that the existing training program represents a policy for which the city is responsible. *Id.* at 389. Rather, the focus must be on whether the training program is adequate in relation to the tasks the particular officers must perform, and if it is not, on whether such inadequate police training can justifiably be said to represent "city policy." *Id.* at 390. Only where the failure to train reflects a municipality's "deliberate" or "conscious" choice can the failure be an actionable city "policy or custom." *Id.* at 389. Moreover, the identified deficiencies in a city's training program must be closely related to the ultimate injury. *Id.* at 391. A plaintiff alleging a failure to train must show: (1) he was deprived of a constitutional right, (2) the municipality had a training policy that "amounts to deliberate indifference to the constitutional rights of the persons with whom its police officers are likely to come into contact;" and (3) his constitutional injury would have been avoided had the

31

municipality properly trained those officers. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (quotation marks and brackets omitted).

Plaintiffs' police procedures expert, Roger Clark, states that Taser International has issued at least two published legal warnings specifically notifying Taser users to avoid targeting the chest area of person with a known history of heart attacks. Doc. 53, Ex. G, 9. Here, it is undisputed that each Officer Defendant received basic Taser training once from the Merced Police Department; however, Officer Arellano testified that she did not recall subsequent training through the Merced Police Department or updated materials or bulletins regarding Taser use. Officer Hart was trained to avoid deploying a Taser to the head, neck or groin areas, as well as to preexisting injuries if possible. DUF ¶ 89. Officer Arellano was not trained to avoid using a Taser on preexisting injuries.

Mr. Clark also states that Taser International's August 28, 2006 Product Warning – Law Enforcement Taser publication specifically warned Taser users against repeated, prolonged exposure of the Taser discharge against subjects. The publication specifically identified people who exhibit symptoms of "Excited Delirium" (i.e. "sweating profusely"), such as Decedent was exhibiting, as being susceptible to "Sudden In-Custody Death Syndrome." Doc. 53, Ex. G, 9-10. Officer Hart testified that he

was not trained on the limits of how many times a person can be tased, how long a person can be tased, and using the taser against persons who exhibit symptoms of mental impairment. Officer Arellano testified that she was not trained to avoid prolonged or extended Taser use, use on suspects showing symptoms of excited delirium, or encounters with suspects with excited delirium syndrome. *Id.* at 16-18.

Mr. Clark opines that the Merced Police Department did not have a reasonable Departmental written policy, training and guidance regarding the proper methods to deal with delusional and impaired persons. Doc. 53, Ex. G, 3. Officer Hart testified that while he has been trained generally on responding to suspects who appear to be under the influence, he has not had any direct training on the use of force against subjects who appear mentally impaired. Doc. 53, Ex. C, 22-23. Officers Hart and Arellano testified that they were not trained on responding to suspects with excited delirium symptoms.

Mr. Clark further opines that police officers should be trained on the risk of positional or restraint asphyxia and proper restraint techniques to minimize this risk. Plaintiffs do not provide any evidence of the City of Merced's training policies on positional or restraint asphyxia or that Officer Defendants were not adequately trained on the risk of positional or restraint asphyxia.

Plaintiffs' inadequate training claim is tenuous; they have not provided any records, documentation, or explanation of the City of Merced's training and policies. Mr. Clark's expert report and Officer Defendants' deposition testimony, however, raise questions whether the identified deficiencies in the City of Merced's training with respect to Taser use, excited delirium, and use of force on suspects who are mentally impaired or under the influence also included restraint asphyxia. Drawing all inferences in Plaintiffs' favor, this evidence is sufficient to withstand a motion for summary judgment on failure to train. Defendants' motion for summary judgment as to the Second and Third Causes of Action on Plaintiffs' failure to train claim is DENIED.

> ### 2.   Ratification

"A policy or custom may be found . . . in the failure of an official 'to take any remedial steps after the violations.'" *Gomez v. Vernon*, 255 F.3d 1118, 1126-27 (9th Cir. 2001) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991)). A municipal policy "may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Menotti,* 409 F.3d at 1147 (quoting *Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 929 (9th Cir. 2001)). To prove ratification, a plaintiff must show that the "authorized

policymakers approve a subordinate's decision and the basis for it." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting *St. Louis v. Prapotnik*, 485 U.S. 112, 127, 108 S.Ct. 915 (1988)). "Ordinarily, ratification is a question for the jury." *Iopa*, 176 F.3d at 1238-1239.

Plaintiffs assert that Officer Defendants defied City of Merced policy without impunity and Officer Defendants' decision making was apparently and/or tacitly endorsed by Sheriff Thomas and City of Merced. Defendants contend that Plaintiffs' ratification claim fails because it is based solely on the subject incident. Plaintiffs have not offered evidence of any other incident of alleged ratification. The Ninth Circuit, however, has found a municipality liable for an isolated constitutional violation where the final policymaker ratified a subordinate's actions. *Id.* at 1238.

Although a ratification claim can be based on a single incident where a final policymaker ratified a subordinate's actions, Plaintiffs have not established a genuine issue of material fact that a final policymaker ratified Officer Defendants' actions. Plaintiffs have not provided evidence that any final policymaker even had knowledge of Officer Defendants' alleged unconstitutional acts, or that he or she approved such acts. *See id.* at 1239 ("A policymaker's knowledge of an unconstitutional act does not, by itself, constitute

35

ratification. Instead, a plaintiff must prove that the policymaker approved of the subordinate's act."). Defendants' motion for summary judgment as to the Second and Third Causes of Action on Plaintiffs' ratification claim is GRANTED.

    D.    <u>Fourth Cause of Action: Assault and Battery (Against Officer Defendants and Does 1-10);</u>

Plaintiffs' claim for assault and battery flows from the same facts as the alleged Fourth Amendment violation for excessive force and are measured by the same reasonableness standard of the Fourth Amendment. *See Edson v. City of Anaheim*, 63 Cal.App.4th 1269, 1272-73, 74, Cal.Rptr.2d 614 (1998); *Munoz v. City of Union City*, 120 Cal.App.4th 1077, 1102 n.6, 16 Cal.Rptr.3d 521 (2004). As discussed above, there are genuine issues of material fact precluding summary judgment and a reasonable fact finder could conclude that Officer Defendants' use of force was unreasonable. Defendants' motion for summary judgment on the Fourth Cause of Action is DENIED.

    E.    <u>Seventh Cause of Action: Negligence – Wrongful Death (Against Officer Defendants, City of Merced, and Does 1-10)</u>

    1.    <u>Officer Defendants</u>

Defendants argue that they are entitled to summary judgment because they did not breach a duty owed to Decedent or to Plaintiffs. Plaintiffs' claim for negligence-wrongful death flow from the same facts as the alleged Fourth Amendment violation for excessive force and are measured by the same reasonableness

standard of the Fourth Amendment. *See Munoz v. City of Union City*, 120 Cal.App.4th 1077, 1102 n.6, 16 Cal.Rptr.3d 521 (2004) ("Federal civil rights claims of excessive force are the federal counterpart to state battery and wrongful death claims; in both, the plaintiff must prove the unreasonableness of the officer's conduct"). For the reasons above, Defendants' motion for summary judgment on the Seventh Cause of Action as to Officer Defendants is DENIED.

    2.   <u>City of Merced</u>

California has not adopted *Monell* and imposes liability on government entities under the doctrine of respondeat superior for acts of government employees. *Robinson v. Solano*, 278 F.3d 1007, 1016 (9th Cir. 2002). California Government Code § 815.2(a) provides:

> A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative.

Cal. Gov't Code § 815.2(a). As discussed above, a reasonable fact finder could conclude that Officer Defendants' use of force was unreasonable. Defendants' motion for summary judgment on the Seventh Cause of Action as to the City of Merced is DENIED.

    F.   <u>Eighth Cause of Action: Negligent Hiring, Retention, Training, Supervision and Discipline (Against City of Merced, Sheriff Thomas, and Does 11-25)</u>

Citing *de Villers v. Cnty. of San Diego*, 156 Cal.App.4th 238,

67 Cal.Rptr.3d 253 (2007), Defendants contend that under California law, a governmental entity is not liable for negligent hiring and supervision absent a mandatory duty. Defendants assert that California's general negligence statute, California Civil Code § 1714, may not supply a statutory basis for negligence. Citing *Price v. Cnty. of San Diego*, 990 F.Supp. 1230, 1245 (S.D. Cal. 1998), Plaintiffs assert that to prevail on their negligence claim, they must show that Officer Defendants acted unreasonably and that the unreasonable behavior harmed Decedent.

Plaintiffs fail to recognize the difference between direct and vicarious liability. Plaintiffs' Eighth Cause of Action for negligent hiring, retention, training, supervision and discipline is a claim of direct liability against City of Merced and Sheriff Thomas in his official capacity, not for vicarious liability based on Officer Defendants' acts within the course and scope of their employment. *See de Villers*, 156 Cal.App.4[th] at 251. Under California Government Code § 815, public entities cannot be held liable in tort except as specifically provided by statute. Cal. Gov't Code § 815. A public entity's direct liability for a tort must be founded on a specific statute apart from the general tort principles in California Civil Code § 1714. *de Villers*, 156 Cal.App.4[th] at 251 (discussing *Zelig v. Cnty. of Los Angeles*, 27 Cal.4[th] 1112, 119 Cal.Rptr.2d 709 (2002), and *Eastburn v. Reg'l Fire Prot. Auth.*, 31 Cal.4[th] 1175, 80 P.3d 656 (2003)). Plaintiffs

38

have not identified a statutory basis for supporting their claim
of direct liability against City of Merced and Sheriff Thomas.
California courts of appeals have concluded that no statutory
basis exists for supporting a claim of direct liability against a
government entity based on its allegedly negligent hiring and
supervision practices. *de Villers*, 156 Cal.App.4[th] at 251; *see
also Munoz v. City of Union City*, 120 Cal.App.4[th] 1077, 1110-1115,
16 Cal.Rptr.3d 521 (2004). Plaintiffs' Eighth Cause of Action
fails as a matter of law. Defendants' motion for summary judgment
on the Eighth Cause of Action is GRANTED.

G.    <u>Claim for Punitive Damages</u>

Punitive damages are recoverable in an action under 42
U.S.C. § 1983 "when the defendant's conduct is shown to be
motivated by evil motive or intent, or when it involves reckless
or callous indifference to the federally protected rights of
others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625 (1983).
Under California law, punitive damages are authorized if a
plaintiff can show by clear and convincing evidence that a
defendant acted with oppression, fraud, or malice. Cal. Civ. Code
§ 3294(a).

Defendants assert that Plaintiffs have produced no evidence
that Officer Defendants' conduct evinced evil intent, malice,
fraud, oppression, or callous indifference to Decedent's or
Plaintiffs' rights. Plaintiffs rejoin that there is a material

question of fact whether Officer Arellano warned the other officers that Decedent had a scar on his chest indicating a preexisting heart condition and whether she told the other officers not to use a Taser on him. Construing the evidence in the light favorable to Plaintiffs, Plaintiffs contend that a reasonable jury could find that Decedent's scar was obvious and openly viewed by Officer Defendants, Officer Arellano warned them not to tase Decedent because of his visible scar, and Officer Hart used the Taser on Decedent multiple times, even after he was prone on his stomach and tased, in bad faith. There is sufficient evidence to create a factual dispute regarding Officer Defendants' intent. Whether Plaintiffs are entitled to punitive damages against Officer Defendants is a question for the jury.

Defendants' motion for summary judgment on the punitive damages claim as to Officer Defendants is DENIED.

### V.    CONCLUSION

For the reasons stated:

1. Defendants' motion for summary judgment, or in the alternative, summary adjudication is GRANTED in part and DENIED in part, as follows:

   a. Defendants' motion for summary judgment as to the First Cause of Action is DENIED as to the Fourth Amendment Claim and GRANTED as to the Fourteenth Amendment Claim.

   b. Defendants' motion for summary judgment as to the

Second and Third Causes of Action is DENIED as to the
failure to train claim and GRANTED as to the
ratification claim.

c. Defendants' motion for summary judgment as to the
Fourth Cause of Action is DENIED.

d. Defendants' motion for summary judgment as to the
Seventh Cause of Action is DENIED.

e. Defendants' motion for summary judgment as to the
Eighth Cause of Action is GRANTED.

f. Defendants' motion for summary judgment as to the claim
for punitive damages is DENIED.

2. Defendants shall submit a proposed form of order consistent
with this memorandum decision within five (5) days of
electronic service of this memorandum decision.

SO ORDERED.

DATED: May 24, 2011.

                                    /s/ Oliver W. Wanger
                                 Oliver W. Wanger
                                 United States District Judge